## COWDREY *v.* COWDREY.

DIVORCE—EXTREME CRUELTY—EQUITY—PUBLIC POLICY.

> In proceedings for a divorce instituted by the wife on the
> ground of extreme cruelty, where the record shows that
> she has been guilty of grave offenses against the marital
> relation, although not guilty of adultery, a divorce is
> not justified on the ground of public policy, and the decree
> of the court below dismissing the bill is affirmed, on
> appeal.

Appeal from Gratiot; Moinet (Edward J.), J. Submitted June 16, 1920. (Docket No. 22.) Decided July 20, 1920.

Bill by Maude G. Cowdrey against Joseph E. Cowdrey for a divorce. From a decree dismissing the bill, plaintiff appeals. Affirmed.

*Smith & Hunter,* for plaintiff.

*O. L. Smith* and *Kelly S. Searl,* for defendant.

BROOKE, J. The parties to this action were married in the year, 1900. At that time, plaintiff was about 18 years of age, while the defendant was 15 years her senior. He was a widower, having one child. A short time after their marriage, they moved upon a 40-acre farm which had belonged to plaintiff's parents, both of whom were dead at that time. She had some brothers and sisters, the interests of all of whom were subsequently acquired by the parties hereto. Aside from her interest in the farm, plaintiff inherited another small property which realized some $275.

Defendant, at the time of his marriage, had $800 or $900 of his own; and inherited from his first wife the life use in $700 or $800 more. All the money re-

On the question of charges of adultery as grounds for divorce, see notes in 18 L. R. A. (N. S.) 300; 34 L. R. A. (N. S.) 360.

ceived from any source by either party appears to have gone into the payment for the old homestead.

After about five years of life on this farm, it was sold for $2,200, and a farm of 60 acres a short distance east of Ithaca, Michigan, was purchased for the sum of $4,800. Here the parties continued to live until plaintiff filed her bill for divorce herein, in April, 1918. During the early part of her married life, plaintiff bore to defendant two children, both of whom died in infancy.

About the year 1911, defendant engaged the services of a young lad named Evit Dunn, to assist him in his farming operations. Dunn, at that time, was about 16 or 17 years of age; and from then to the end of the year 1917 was a member of the household of the parties hereto more than half the time. For one or more seasons he worked the farm on shares.

During the entire married life of the parties, it has been the defendant's custom to be away from home a good share of the time. He was fond of hunting and fishing, making frequent excursions in pursuit of such sport. Upon some of these occasions, when he was absent, Dunn remained upon the farm. The record discloses the fact that the relationship between these three people was of the most cordial and intimate character; Dunn, apparently, enjoying the confidence and affection of both parties. No trouble arose until late in the year 1917. Earlier in that year, Dunn had been called in the draft and defendant had made an unsuccessful effort to secure his exemption upon the ground that he was necessarily engaged in agricultural pursuits. Thereafter, Dunn was sent to Camp Custer, in Battle Creek, Michigan, for training.

It seems that during all the time after Dunn became a member of the family and when absent for considerable periods, it had been customary for him to correspond with plaintiff and defendant, the letters

usually being written to plaintiff. During the later years of their association, this correspondence between plaintiff and Dunn seems to have been carried on in a surreptitious manner, the plaintiff sending her letters to Dunn under cover of letters written by someone else, and receiving Dunn's replies in the same way. None of the earlier letters are found in the record. Two (one dated December 16, 1917, and the other, undated, but apparently of about the same date) are printed in the record. They are couched in language which demonstrates that Dunn had conceived for the plaintiff a highly romantic attachment. They also indicate that Dunn believed plaintiff was being illtreated and threatened by defendant. No letters from plaintiff to Dunn are found in the record, but plaintiff frankly admits that she carried on this correspondence with Dunn clandestinely for several years. She further frankly admitted that she was extremely fond of Dunn, but stoutly maintained that her relations with the young man had always been innocent.

About Christmas time, 1917, Dunn's mother, who was visiting a daughter in Detroit, sent a telegram to plaintiff, asking her to meet her (Mrs. Dunn) in Battle Creek. It is undisputed that defendant knew of the receipt of the telegram; but he claims to have understood that plaintiff was to meet Mrs. Dunn in Detroit, rather than in Battle Creek. Early the following morning, plaintiff accompanied one of Dunn's brothers to Battle Creek and there met the mother. All three of them saw Evit Dunn in barracks at the camp, and later went to Detroit together.

In the meantime, defendant discovered in his home the two letters from Dunn to plaintiff, and then, for the first time (according to his claim) he became suspicious that the relationship subsisting between Dunn and his wife was an improper one. He immediately went to Detroit, and, having learned that his wife and

Evit Dunn and his mother would reach Detroit on a certain train, met them at the station. He took his wife away from her companions and to a hotel.

There is a sharp dispute in the record as to what occurred between the parties that night at the hotel. Plaintiff claims that defendant charged her with having committed adultery with Dunn, and demanded that she surrender her interest in the farm to him with the alternative that he would cause her arrest for adultery if she did not. The following morning, he returned to Ithaca with her, stopping for a few days at a hotel in that town, in order (as he says) that an opportunity might be afforded for Dunn to get back to camp before he and his wife should return to the farm. Early in January, 1918, they went home together, and remained there until the latter part of February, when plaintiff left him. Some time afterward, she filed this bill, charging the defendant with extreme cruelty.

It is her claim that about the year 1906 she suffered from vaginal cystic tumors; that, despite her condition and the fact that she informed the defendant that sexual intercourse was extremely distasteful and highly painful and that it was always followed by hemorrhage, defendant insisted upon gratifying his sexual demands to an abnormal degree; that this continued until about the year 1912, when a "growth" appeared in the vagina which gradually became enlarged until sexual commerce was impossible; that defendant was well aware of this condition and consented to and did, at length, desist from all attempts to perform the sexual act, though he frequently upbraided her for her condition and said that no man could live "that way." After their return to the farm, in January, 1918, it is the claim of plaintiff that defendant continued to threaten her and to demand that she surrender to him her interest in the farm.

Defendant admits that many conversations were had during those weeks between the parties and that he urged her to place the title of the farm in his name; but contends that he never demanded that she should "sign off."

Four or five days before her final departure, an episode occurred in the course of which (it is plaintiff's claim) defendant attempted by force to have sexual intercourse with her. This defendant denies, but admits that he demanded that she should submit to a digital examination in order that he might assure himself that her claims as to incapacity were well grounded. Some personal violence was used on this occasion, the exact extent of which being in dispute.

The answer of the defendant is a denial of the allegations of the bill, and charges plaintiff with misconduct with Evit Dunn, but does not charge adultery. And many times, in the course of a long hearing, counsel for defendant distinctly disclaimed that a charge of adultery had been made or that defendant desired any affirmative relief.

The learned circuit judge, under the authority of *Kellogg* v. *Kellogg*, 171 Mich. 518, and kindred cases, dismissed plaintiff's bill on the ground that she had been guilty of such misconduct as precluded her from relief in a court of equity.

While we are satisfied from a careful reading of this very voluminous record that plaintiff has not been guilty of adultery with Evit Dunn, we cannot overlook the fact that, according to her own admissions, she has been guilty of very grave offenses against the marital relation. It goes without saying that no discreet wife would have engaged in a clandestine correspondence with one of the other sex, not related to her, no matter how intimate and innocent the relations between the parties happened to be; and it is hardly conceivable that a mere boy (such as the record

shows Evit Dunn to have been at the time this correspondence was carried on) would have engaged in such an enterprise without encouragement, either active or passive, from the object of his passion.

We have given careful consideration to the claim advanced on the part of the plaintiff that this case falls within that line of cases, a good example of which is *Weiss* v. *Weiss*, 174 Mich. 431, and that a divorce should be decreed between the parties upon the ground of public policy; but we feel that, while the record discloses no such degree of moral turpitude on the part of the wife as was evidenced in the case of *Kellogg* v. *Kellogg, supra,* to grant plaintiff relief in the case at bar would be to create a dangerous precedent which the court should avoid.

During the pendency of the action, this court allowed the plaintiff the sum of $400 on account of attorneys' fees and expenses, and $5 per week alimony. She will recover in this court an attorney fee of $200, plus her taxable costs in both courts, less the sum of $400, heretofore allowed.

The decree must be affirmed.

STEERE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred. MOORE, C. J., did not sit.